UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KEVIN PRESSLEY,

                                       Plaintiff,

                     -against-

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                       Defendant.
-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:___    9/16/2016
```

15-CV-04245 (SN)

<u>ORDER AND OPINION</u>

**SARAH NETBURN, United States Magistrate Judge.**

Plaintiff Kevin Pressley brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), and seeks judicial review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for Social Security Disability Insurance Benefits ("DIB" or "disability"). Both parties moved for judgement on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Because the decision of the administrative law judge ("ALJ") was supported by substantial evidence and without legal error, the plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion for judgment on the pleadings is GRANTED.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB on June 24, 2011, alleging an onset date of April 9, 2011, for shoulder and elbow impairments, a cervical spine impairment and depression. Pressley's compensable disability period ended on December 31, 2012, when his insured status expired. His application was denied. Pursuant to Pressley's request, an ALJ held hearings on December 5, 2012, and June 12, 2013. On July 25, 2013, the ALJ issued a decision in which he found that Pressley was incapable of performing his past work as a bricklayer. The ALJ determined that

Pressley had the residual functional capacity ("RFC") to perform the full range of light work, but with additional restrictions to his upper right extremity. The ALJ determined that there are jobs that exist in significant numbers in the national economy that Pressley could perform, and thus found him not disabled. On March 26, 2015, the Appeals Council denied Pressley's request for a review of the ALJ's decision.

On June 2, 2015, Pressley filed his complaint challenging the denial of his application for DIB under 42 U.S.C. § 405(g). On March 7, 2016, Pressley moved for judgment on the pleadings, arguing that (i) the ALJ failed to weigh the medical evidence from Pressley's treating physicians properly; (ii) the ALJ's RFC finding was not supported by substantial evidence; (iii) the ALJ should have considered evidence of mental health impairments in his RFC analysis; (iv) the ALJ did not adequately develop the record; and (v) the ALJ failed to evaluate Pressley's subjective complaints of pain properly. The Commissioner cross-moved for judgment on the pleadings, contending that there was substantial evidence to support the ALJ's decision.

## FACTUAL BACKGROUND

### I.     Testimonial and Non-Medical Evidence

On a Social Security Administration ("SSA") Function Report completed August 2, 2011, Pressley wrote that on a typical day, he dressed himself, prepared cereal for breakfast, made sandwiches for his daughters, occasionally attended physical therapy, tried to do some light chores, watched television and helped his younger daughter with her homework. He noted that he experienced pain and some difficulties with bathing and dressing himself each day. Pressley wrote that he was not able to enjoy his previous hobbies, such as fishing, playing basketball and tennis, or cooking. He noted that he "[did] not do anything anymore except watch TV and spend some time with [his] daughters." (AR 253.)

2

Pressley reported that he could not lift anything with his right arm, and could lift only "a little bit" with his left arm. (AR 253.) He wrote that standing for too long caused numbness and severe pain, and that he likewise was unable to walk or sit for long periods of time. Pressley noted that he was unable to climb stairs, kneel or squat. He wrote that he had difficulty sleeping due to pain and side effects from his medications. Pressley reported that the stress from his disability "paralyzed him" and made him "depressed." (AR 256.)

In a Disability Report dated October 20, 2011, Pressley wrote that his shoulder surgery on July 18, 2011, was a "failure" and reported that it had "not changed [his] range of motion" and had "severely increased" his pain and weakness in his right arm. (AR 259.) He noted that he was "weaker and more depressed," and suffered from gastrointestinal bleeding as a side effect from his prescription painkillers. Id.

At the hearing on December 5, 2012, Pressley testified that he was 48 years old and had an associate's degree from the American Business Institute. He lived with his two daughters, ages 12 and 20. Pressley previously had worked as an international brick mason, but stopped working on October 11, 2007, after he was injured on the job. He received workers' compensation benefits after his injury. Pressley received treatment at Wilson Orthopedics for his right shoulder injury and underwent two separate surgeries. He testified that after the second surgery, he continued to experience a "shooting pain" going up his shoulder and to the back of his neck. (AR 125.) Pressley said that his doctor recommended a third surgery to repair a tear in his shoulder muscle, but Pressley refused.

Pressley testified that he could lift 20 pounds with his right hand, but only for a short period. He said that headaches and back pain prevented him from walking more than a few city blocks at a time. Pressley stated that he previously had taken prescription medicines to treat his

3

pain, but that the medicine caused internal bleeding so he switched to over-the-counter medications.

Pressley told the ALJ that he did not think he was capable of keeping any type of job. He said that he would be able to perform a job answering phones for "a day or two," but then would experience too much pain to continue working. (AR 122.) He said that he would be unable to keep his right arm at desk height for longer than five to ten minutes at a time. Pressley stated that to manage his pain, he would need to take prescription medications that would leave him too incoherent to work.

Pressley testified that he visited a psychiatrist in 2010 or 2011, who suggested that he begin treatment for depression. Pressley indicated that he was not currently taking any psychiatric medications or receiving mental health counseling.

At the second hearing, on June 12, 2013, Pressley stated that he drove about an hour to attend the hearing. He testified that at his job as a bricklayer, he typically had to lift approximately 30 pounds at a time. Pressley said that he was no longer capable of performing a job that would require him to lift things, due to pain in his shoulder, elbows and neck. He stated that he was right hand dominant and did not think he would be capable of performing a job that required him to use his right hand. He said that he was able to lift a book or telephone with his right hand, but that he would not be able to repeat the motion throughout an entire workday. When asked how long he would be able to sit at a desk and type, Pressley estimated that he would begin to experience pain after fifteen minutes.

Pressley said that his older daughter helped him to care for his younger daughter, and that both of his children cleaned the house, cooked and did laundry. If any repairs to his house were needed, his superintendent took care of them. Pressley stated that he did not have any friends, but

4

that he occasionally spoke with his parents and visited his diabetic mother at her nearby apartment once a week.

Pressley said that he had received a second medical opinion from Dr. David Gonzalez, who told him that a third surgery would not help his shoulder and that he would continue to suffer from arthritis pain.

At the June 12, 2013 administrative hearing, Dr. Robert Kendrick, a board certified orthopedic surgeon, testified that Pressley suffered from supraspinatus tendinopathy, with an incomplete internal septal tear. He said that it was unclear from the record what had caused Pressley's shoulder impingement. Dr. Kendrick testified that there was evidence of a disc protrusion in Pressley's cervical spine, from C2 to C6. He testified that there was no evidence of limitations to Pressley's ability to walk, stand or use his left arm and shoulder. Dr. Kendrick stated that Pressley had close to normal forward elevation in his right arm and should be capable of occasionally lifting up to five pounds. He testified that Pressley was not able to lift any objects overhead, but could lift up to five pounds to desk and chest level. Dr. Kendrick stated that Pressley "may feel discomfort with every lift," but that he could perform these actions "in spite of the pain." (AR 98.) He admitted, however, that there may be times when Pressley's pain would be exacerbated and he would be unable to lift five pounds.

Vocational expert Dr. Yako Thits testified at the June 12, 2013 hearing that Pressley would not be able to perform his former job as a bricklayer. The ALJ presented Dr. Thits with a hypothetical person with Pressley's background, who had no use of his dominate right arm, but had no other restrictions and could lift and carry up to light limits. Dr. Thits testified there were jobs suitable for a person fitting this description, including counter clerk, information clerk and usher.

## II.      Treatment Before Claimed Disability

### A.      Robert J. Orlandi, M.D.

In April 2008 orthopedic surgeon Robert J. Orlandi, M.D., began regularly seeing

Pressley in connection with his workers' compensation claim. At his initial appointment, Dr.

Orlandi noted that Pressley complained of pain in both elbows. An examination revealed no

angular or rotary deformities and no atrophy or dystrophy in either elbow. Pressley had full range

of motion in both elbows, but the right elbow lacked 10 degrees of extension. An MRI of

Pressley's left elbow showed lateral epicondylitis, but an MRI of the right elbow revealed no

abnormalities. Dr. Orlandi diagnosed Pressley with bilateral epicondylitis and recommended

surgery on both elbows. He concluded that Pressley had a "moderate marked disability as both

arms are involved." (AR 308.)

At later appointments, Pressley reported improvement in both elbows, particularly

following epicondyle release of the left elbow on May 12, 2008, and of the right elbow on May

22, 2010. At a November 2, 2009 examination, Pressley said that his elbows were "much better,"

but reported localized tenderness in his shoulders. (AR 295.) Dr. Orlandi observed no angular or

rotary deformity and no atrophy or dystrophy in either shoulder and noted that Pressley had

normal range of motion.

On July 12, 2010, Dr. Orlandi examined Pressley's right shoulder, but found no angular

or rotary deformity. Pressley was capable of a full range of normal rotation of his right shoulder.

Dr. Orlandi wrote that a January 4, 2010 MRI scan had revealed only "irregularity over the

bursal surface of the distal tendon to suggest a small partial tear," but no impingements or tears.

(AR 287.) In his examination notes, Dr. Orlandi noted his disagreement with Dr. Wilson's

recommendation that Pressley undergo an arthroscopy of the right shoulder. He diagnosed

Pressley with "inconsequential subjective tenderness" over each lateral epicondyle status post initial left and right elbow lateral epicondyle releases. (AR 288.) Dr. Orlandi believed that Pressley was "unquestionably not experiencing a pain syndrome" and "[did] not have a disability from prior work activities." (AR 289.) He concluded that Pressley could "work without restriction." Id.

### B.    Alain De La Chapelle, M.D.

On October 30, 2009, Alain De La Chapelle, M.D., conducted a psychiatric examination at the request of the Workers' Compensation Board ("WCB"). He noted that Pressley had previously seen a psychologist named Dr. Pace. Pressley reported nervousness about his health, a depressed mood, and insomnia due to pain and anxiety. He reported continuous pain in his neck and arms, which he rated a seven on a ten-point scale. Dr. De La Chapelle diagnosed Pressley with depression, NOS, and recommended that he seek further psychiatric treatment. He concluded that from a psychiatric viewpoint, Pressley had a "mild, partial work-related disability," but was able to return to work on a part-time basis with light duties to minimize stress. (AR 303.)

### III.    Post-Disability Medical Records

### A.    Disability Opinions of Treating Physicians

### 1.    Wilson Orthopaedics

Orthopedic surgeon Arnold B. Wilson, M.D., began treating Pressley on October 11, 2007. He initially diagnosed Pressley with bilateral tennis elbow, and performed surgical epicondyle releases of his right and left elbows on May 12, 2008 and March 22, 2010, respectively. In July 2009, Dr. Wilson diagnosed Pressley with shoulder tendinitis, likely caused

by a combination of his initial injury and a compensatory reaction to limited range of motion in his lower arms.

In January 2010, MRI scans revealed a partial tear of the supraspinatus tendon, tendinopathy and multiple disc bulges. Dr. Wilson diagnosed Pressley with a rotator cuff tear of the right shoulder, lateral epicondyltitis and a cervical sprain. On March 3, 2010, Dr. Wilson noted painful range of motion in Pressley's right shoulder, with "obvious signs of impingement." (AR 311.) He recommended surgery on his shoulder and concluded that he remained fully disabled. On October 11, 2010, Dr. Wilson performed a surgical arthroscopy of the right shoulder. During the surgery, he noted fraying to the labral tissues and tearing and inflammation of the rotator cuff. He completed an extensive debridement of the shoulder joint and a subacromial decompression.

In treatment notes from February 8, 2011, Dr. Wilson wrote that Pressley remained "symptomatic and out of work" and reported neck pain and constant numbness in his right upper extremity radiating down to his fingers. (AR 390.) He recommended that Pressley continue physical therapy.

In May 2011, the WCB denied Dr. Wilson's request for authorization for additional physical therapy sessions for Pressley, but granted his request for authorization to perform an anterior acromioplasty of the shoulder. On July 18, 2011, Dr. Wilson performed a right shoulder manipulation under anesthesia.

At a July 29, 2011 follow-up appointment, Dr. Wilson noted that Pressley complained of stiffness and burning in his right shoulder. Pressley said that he had stopped taking Vicodin after experiencing an allergic reaction. His shoulder exhibited mild swelling and no signs of infection. Dr. Wilson noted that flexion was 75 degrees, abduction was 75 degrees, internal rotation was 30

degrees, and external rotation was 30 degrees. He recommended physical therapy with an emphasis on an "aggressive range of motion and muscle strengthening exercises." (AR 391.) He wrote that Pressley should remain out of work for the time being.

On August 18, 2011, Dr. Wilson completed a Physical Capacity Evaluation in connection with Pressley's DIB claim. He concluded that Pressley was capable of performing sedentary work, which involved lifting ten pounds maximum, occasionally lifting or carrying small objects, and sitting with occasional walking or standing. Dr. Wilson found that in an eight-hour workday, Pressley would be able to sit for four hours or less and stand or walk for three hours or less. He wrote that Pressley occasionally could lift up to ten pounds, but should avoid lifting any weight over that. Dr. Wilson found that Pressley occasionally could bend at the waist, squat and reach overhead. He concluded that Pressley was capable of performing fine manipulations and simple grasping and gripping with both hands. He noted that Pressley would not be able to pull or push arm controls or engage in repetitive overhead reaching with his right arm. Dr. Wilson noted that Pressley was able to use both legs throughout the day for sustained, repetitive action.

At an August 23, 2011 follow-up appointment, Dr. Wilson noted a painful abduction to 70 degrees and painful forward flexion to 90 degrees. He recommended continued "aggressive" physical therapy. (AR 392.) At appointments on September 20 and October 20, 2011, Dr. Wilson noted gradually increasing forward flexion and abduction. At a November 23, 2011 appointment, however, there was a decrease in both forward flexion and abduction, and Pressley reported diffuse pain running from the AC joint to the posterior shoulder. He refused a cortisone injection.

On December 19, 2011, Pressley visited Donald E. Heitman, M.D., Dr. Wilson's colleague and an orthopedic surgeon at Wilson Orthopaedics. Dr. Heitman noted forward elevation of 110 degrees, abduction of 85 to 90 degrees, but external rotation of 20 degrees with

an internal rotation to S2. He noted that he would seek authorization for an MRI of Pressley's right shoulder to check for any underlying pathology.

According to the radiologist's report, an MRI taken of Pressley's right shoulder on December 28, 2011, revealed "marked fraying and irregularity and high-grade partial-to-full thickness tear of both the bursal and articular surface of the supraspinatus tendon." (AR 569.) It also showed fraying of the infraspinatus tendon.

At a January 16, 2012 appointment, Dr. Wilson recommended continued physical therapy and noted that if Pressley's symptoms persisted, he may require a third arthroscopic surgery and a repeat manipulation under anesthesia. On February 27, 2012, Dr. Heitman observed forward elevation to 110 degrees actively and 115 degrees passively and abduction to 95 degrees actively and 110 degrees passively. He noted external rotation to only 20 degrees and internal rotation to S3. Dr. Heitman recommended aggressive physical therapy. Pressley declined a cortisone injection and Dr. Heitman noted that he had received his last injection in October or November 2011.

On April 25, 2012, Dr. Wilson noted that Pressley was attending physical therapy and was "finally starting to make some improvements in his motion to the right shoulder." (AR 530.) He noted continued pain along the anterior lateral shoulder. On May 11, 2012, the WCB approved Dr. Wilson's request for authorization for an additional four to six weeks of physical therapy for Pressley's right shoulder.

In his visit notes from summer 2012, Dr. Heitman wrote that Pressley continued to complain of pain in his shoulder. He noted that immediately following the June 18, 2011 manipulation, Pressley did not receive physical therapy for "a considerable amount of time," which could explain his persistent shoulder stiffness. (AR 490.) Dr. Heitman wrote that he had

no external rotation in both the neutral and 90-90 positions. He recommended an additional arthroscopic procedure to repair Pressley's rotator cuff, and noted that he would seek authorization from the WCB to perform the procedure.

In a Doctor's Progress Report to the WCB dated August 2, 2012, Dr. Wilson noted right shoulder rotator cuff tear and reported a 100 percent temporary impairment. On August 6, 2012, the WCB granted Dr. Wilson's request for authorization for a third arthroscopic surgery on Pressley's right shoulder.

On October 3, 2012, Dr. Wilson noted that Pressley was still 100% disabled due to a right shoulder impediment.

### 2. Montefiore Hospital

On August 15, 2011, Pressley was treated for rectal bleeding by Deborah White, M.D., at Montefiore Hospital. A radiology report revealed no abnormalities or obstructions. A urinalysis report was likewise negative for any diseases or abnormalities. He was diagnosed with diverticulosis and advised to eat a higher fiber diet. At a follow-up visit with gastroenterologist Deborah Sherman, M.D., Pressley reported that he had not experienced rectal bleeding for a few days. Dr. Sherman noted that blood in Pressley's stool was likely from constipation caused by the painkillers he took after his July 2011 surgery.

### 3. David Gonzalez, M.D.

Pressley began receiving treatment from David Gonzalez, M.D., on May 1, 2013. He told Dr. Gonzalez that he wanted an opinion regarding the final status of his right shoulder. A physical examination revealed a limited range of motion for both active and passive movement. An MRI taken a few weeks later revealed changes within the rotator cuff consistent with intrasubstance or interstitial tearing, as well as some early degenerative changes of the

glenohumeral joint. Dr. Gonzalez advised Pressley not to undergo a third operation because there was no guarantee it would improve his pain or range of motion. Instead, he recommended that he "accept his deficits and avoid lifting or overhead movement." (AR 741.)

**B.    Disability Opinions of Non-Treating Physicians**

**1.    Stanely Soren, M.D.**

Consultative examiner Stanely Soren, M.D., performed an orthopedic consultation on March 4, 2011. At the appointment, Pressley complained of right shoulder pain. Pressley told Dr. Soren that his right elbow had improved, but that he was still not able to straighten his arm.

Dr. Soren diagnosed Pressley with: (i) bilateral epicondytitis of the elbows; (ii) status post left elbow surgery, lateral epicondyle and release ostectomy of the left elbow; (iii) cervical radiculopathy/cervicalgia; (iv) release of right elbow lateral apicondyle; and (v) impingement of the right shoulder with partial tear of the rotator cuff status post arthroscopic surgery. Dr. Soren observed that Pressley had shown "limited response to treatment" and recommended surgical lysis and arthroscopically of the right shoulder with manipulation of the shoulder under anesthesia, with follow-up physical therapy. (AR 284.) If Pressley opted to forego a third surgery, Dr. Soren noted that his shoulder would have "reached maximum medical improvement." Id.

Dr. Soren wrote that Pressley could "certainly return to an office situation, light duty," and recommended that Pressley avoid excessive reaching and pointing overhead with the right arm. Id. He restricted Pressley from climbing ladders and occasionally lifting more than 20 pounds.

An October 21, 2011 cervical spine exam revealed a 20-degree limitation of motion on the right lateral rotation. Pressley's had no tenderness in either shoulder. His right side abduction

and forward flexion were 80 degrees and 70 degrees, respectively, showing a limited range of motion. Pressley lacked 15 degrees of extension on his right elbow and 10 degrees on the left.

Dr. Soren found that Dr. Wilson's diagnoses were correct and supported by objective findings. He also concluded that Pressley's current treatment was "reasonable and necessary." (AR 588.) Dr. Soren recommended continuation of the "aggressive rehabilitation program" for a minimum of eight weeks, but wrote there was no indication for any further treatment of the elbows or cervical area. Id. He found that if at the completion of his rehabilitation program there was no significant improvement of the right shoulder, Pressley would reach a point of maximum medical improvement. Dr. Soren concluded that Pressley had a temporary, moderate partial disability, which would permit him to return to a full-time light duty office job.

### 2. Dr. T. Begeal

On October 7, 2011, Dr. T. Begeal completed a Physical Residual Functional Capacity Assessment for the SSA. Pressley reported back, neck and right shoulder pain, as well as numbness and weakness in both elbows. He had limited range of motion in his cervical spine with flexion of 45 degrees and extension of 30 degrees. Pressley also had limited range of motion in both shoulders and full range of motion in both elbows. Dr. Begeal rated his strength 4/5 in his upper right extremity and 3 to 4/5 in his upper right extremity. His hand and finger dexterity were intact and rated 5/5 and 4/5 on the left and right, respectively. Dr. Begeal recommended that Pressley "avoid overstress in his neck and shoulders," (AR 371), and "avoid overhead reaching due to neck and bilateral shoulder [range of motion] limitation and pain." (AR 372.) He noted that Pressley's symptoms and limitations are "consistent with his MDIs and supported by the MER on file" and found Pressley "fully credible." (AR 373.) Dr. Begeal concluded that Pressley was able occasionally to lift or carry up to ten pounds, stand or walk for

at least two hours each eight-hour workday, sit with normal breaks for a total of six hours each workday, and engage in unlimited pushing or pulling of hand and/or foot controls.

### 3. Sharon Revan, M.D.

On August 22, 2011, Sharon Revan, M.D, conducted a consultative examination on behalf of the SSA. Dr. Revan noted that Pressley's left elbow extended fully and his right elbow had a right contracture. Pressley told her that both elbows were weak and numb. He rated his shoulder pain as a nine out of ten and told her that physical therapy exacerbated his shoulder condition. Pressley also reported experiencing back and neck pain after walking a block, as well as right shoulder and neck pain while sitting.

Dr. Revan's examination revealed a cervical spine flexion of 45 degrees, extension of 30 degrees, and full lateral flexion and rotation. She noted forward elevation of the shoulders of 80 degrees on the right and 50 degrees on the left. Shoulder abduction was measured at 60 degrees on the right and 150 degrees on the left, and adduction was full on both sides. Dr. Revan noted internal rotation of 20 degrees on the right and 40 degrees on the left, as well as external rotation of 40 degrees on the right and 90 degrees on the left. Pressley had full range of motion in his elbows, forearms and wrists bilaterally. She noted full range of motion in his left hip with accompanying groin pain. His strength measured 5/5 in the lower extremities, 4/5 in the left upper extremity and 3-4/5 in the right upper extremity. Dr. Revan found that Pressley's hand and finger dexterity were intact and rated his grip strength as 4/5 on the right and 5/5 on the left.

Dr. Revan concluded that Pressley had "moderate limitations with the upper right extremity for gross motor activities due to shoulder pain." (AR 348.) She found limitations with sitting due to shoulder and neck pain and limitations laying down due to left sided pain. Dr. Revan noted "mild limitations" for fine motor activity with the hands, walking distances, standing, and for personal grooming and activities of daily living. Id.

### 4.     Steven D. Zaretsky, M.D.

At the request of the WCB, orthopedic surgeon Steven D. Zaretsky, M.D., examined

Presley on February 20, 2012. He wrote that after the July 18, 2011 surgery, Pressley received

physical therapy for his right shoulder twice a week for approximately two and a half months

"without significant improvement." (AR 515.) Pressley rated his right elbow pain as a five, his

left elbow pain as a three, and his right shoulder pain as an eight. He said that he occasionally

experienced cervical spine pain that woke him from his sleep. A physical examination revealed

mild impairments in both elbows and active range of motion in his right shoulder of 120 degrees

forward flexion, 90 degrees abduction, 50 degrees external rotation and L4-5 internal rotation

with complaints of pain on extremes of motion. Dr. Zartestky noted positive impingement signs

and weakness on isolation of surapsinatus to 4/5.

Dr. Zaretsky noted that MRI studies revealed evidence of a high-grade partial or

complete full-thickness rotator cuff tear. He recommended granting authorization for

arthroscopic evaluation with either arthroscopic rotator cuff repair or mini-open repair followed

by a course of physical therapy. If Pressley refused surgical treatment, he recommended

continued at-home exercises under the management of his treatment physician. He concluded

that Pressley had not reached maximum medical improvement of his right shoulder, but had

reached maximum medical improvement of his cervical spine and both elbows. Dr. Zaretsky

found that Pressley could engage in gainful employment, but should avoid lifting greater than ten

pounds or reaching above the horizontal plane of the shoulder with the right upper extremity.

In March 2013, Dr. Zartesky was asked to comment on whether Pressley had reached

maximum medical improvement if he opted not to pursue a third shoulder surgery. Dr. Zartesky

wrote that if Pressley chose not to have the surgery, he could consider a corticosteroid injection

with lidocaine, coupled with a course of aggressive physical therapy in order to improve his

strength and range of motion. If, however, Pressley chose to end treatment entirely, then he would have reached maximum medical improvement with a permanent 66.7% scheduled loss of utilization of his right arm and a 7.5% scheduled loss of utilization of his left arm.

### 5.   Michael H. Rosenfeld, Psy. D.

At the request of the SSA, Michael H. Rosenfeld, Psy. D. examined Pressley on April 27, 2011. Pressley told Dr. Rosenfeld that he had been meeting regularly with a psychologist for the past two years. He reported that initially following his injury in October 2007, he experienced "general nervousness and 'stress,' a depressed mood (due to pain and being out of work), insomnia due to pain and anxiety and irritability." (AR 276.) Pressley told Dr. Rosenfeld that he currently suffered from pain in his right shoulder and numbness in his right arm. He reported continued feelings of general nervousness, stress and a depressed mood and said that he suffered from insomnia due to pain and anxiety.

Dr. Rosenfeld noted that Pressley was well groomed and appeared to walk with no obvious pain or discomfort. He observed that Pressley was "cooperative and polite with average social skills, good eye contact, and appears to be of average intellect." (AR 278.) Dr. Rosenfeld did not note any evidence of delusions or hallucinations and reported that Pressley's concentration was good. He described Pressley's mood as euthymic and noted that he displayed a full range and calm and reactive affect.

Dr. Rosenfeld diagnosed Pressley with adjustment disorder with mixed anxiety and depressed mood. He found that Pressley's psychological complaints were causally related to his work-related injuries. Dr. Rosenfeld concluded that Pressley had "no work-related disability," and concluded that "from a psychological viewpoint, the claimant is able to perform his usual daily activities and the claimant can return to work without restrictions." (AR 278.)

### 6.      Joyce R. Schreiber, Ed. D.

On August 22, 2011, Joyce R. Schreiber, Ed. D., conducted a consultative psychiatric evaluation at the request of the SSA. Pressley told her that he had difficulty falling asleep and regularly woke up two to three times throughout the night. He admitted to symptoms of depression and anxiety, including dysphoric moods, psychomotor retardation, fatigue, loss of energy, feelings of worthlessness, low self-esteem, muscle tension and fearfulness of not being able to work again. Dr. Schreiber noted that Pressley's thought processes were coherent and goal directed, with no evidence of hallucinations or delusions. His attention and concentration were also intact. Dr. Schreiber described Pressley's mood as "somewhat" sad and depressed. (AR 342.) She found him to have intact memory skills and to be of low-average intellectual functioning.

Pressley told Dr. Schreiber that he was unable to fully dress, bath and groom himself. He said that his children assisted him with these tasks and also helped with household chores. He said that he spent his days lying in bed, watching television, going to doctor's appointments, and spending time with his children.

Dr. Schreiber noted that Pressley appeared to be capable of following instructions, maintaining attention and concentration, regularly maintaining a schedule, and making appropriate decisions. She observed that he had some difficulty dealing with stress and concluded that the "results of the examination appear to be consistent with some psychiatric problems, but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (AR 343.)

### 7.      Dr. T. Harding

On September 27, 2011, Dr. T. Harding completed a psychiatric consultative examination for the SSA. He noted that Pressley reported difficulty falling asleep and often woke up two to

three times throughout the night. Dr. Harding wrote that Pressley experienced depressive symptoms, including "dysphoric moods, psychomotor retardation, loss of usual interests, increased irritability, fatigue and loss of energy, feelings of worthlessness, diminished self-esteem [and] diminished sense of pleasure." (AR 367.) He observed that Pressley displayed a depressed mood and appeared somewhat sad. Dr. Harding diagnosed Pressley with generalized anxiety disorder and depressive disorder, but found that the evidence did not satisfy any of the Listings criteria for a mental disorder. He concluded that Pressley could understand and follow simple instructions and directions, perform simple tasks, maintain attention and concentration, and keep a regular schedule. Dr. Harding noted that he would "do better in a low stress setting." Id.

## DISCUSSION

### I.    Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Commissioner's determination may be set aside only if it is based upon legal error or is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the

findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. See Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there is also substantial evidence for the plaintiff's position. See Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).

## II.     Definition of Disability

A claimant is disabled under the Act if she demonstrates an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The SSA has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

If an impairment is found to be "severe" at step two, the ALJ looks to the Listings, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, to determine if it qualifies as a listed impairment at step three. 20 C.F.R. § 404.1520a(d)(2). A major dysfunction of a joint qualifies as a listed impairment if it is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space show narrowing, bony destruction, or ankyloses with the affected joint(s)." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02. Additionally, a claimant must show evidence of "[i]nvolvment of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross motor movements effectively." Id. Inability to perform fine and gross movements effectively is defined as "an extreme loss of function of both upper extremities . . . To use their

20

upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." Id. Examples of inability to perform fine and gross movements effectively include the inability to prepare a meal and feed oneself, the inability to maintain personal hygiene, the inability to sort and handle papers or files, and the inability to places files in a cabinet at or above waist level. Id.

### III.   The ALJ's Determination

In his July 25, 2013 decision, the ALJ found that Pressley had not been under a disability within the meaning of the Act since April 9, 2011, and denied his DIB application.  Although the ALJ determined that Pressley had severe impairments of "cervical spine disc protrusion at C2 to C6, and right shoulder pain status post arthroscopic surgeries," he concluded that these impairments did not meet or medically equal a Listings severity. (AR 24.) He found that Pressley retained the RFC to perform "light work," with the exception that with the right upper extremity, he could not perform overhead lifting and could only lift or carry up to two pounds occasionally. (AR 26.) The ALJ concluded that Pressley had no restrictions on his left upper extremity and found that when using both hands, he could lift or carry up to ten pounds frequently and up to 15 pounds occasionally. Based on this finding, the ALJ concluded that Pressley was incapable of performing his past job as a bricklayer. He found, however, that there were sufficient jobs in the national economy that someone with Pressley's RFC would be capable of performing. Accordingly, the ALJ concluded that Pressley was not disabled.

### IV.   Analysis

On appeal, Pressley argues that: (i) the ALJ failed to weigh the evidence properly in violation of the treating physician rule; (ii) the ALJ's decision was not supported by substantial

evidence; (iii) the ALJ erred by failing to consider evidence of mental health impairments in his RFC determination; (iv) the ALJ failed to develop the record; and (v) the ALJ did not evaluate Pressley's subjective complaints of pain properly. In her cross-motion, the Commissioner argues that substantial evidence supports the ALJ's findings that Pressley was not disabled.

### A.      The Treating Physician Rule

The ALJ must give "controlling weight" to the opinion of a claimant's treating physician unless that opinion is inconsistent with other evidence in the record. 20 C.F.R. § 416.927(c)(2). "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). These factors include the length, nature, and extent of the treatment relationship, the extent to which the treating physician's opinion can be supported by the record, and the physician's area of specialization. 20 C.F.R. § 404.927(c)(2). "It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule." Martinez-Paulino v. Astrue, 11 Civ. 5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2010) (citing Halloran, 362 F.3d at 32)). "The failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted). But "[r]emand is unnecessary" where "application of the correct legal standard could lead only to the same conclusion." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (internal quotation marks and punctuation omitted).

Here, the ALJ assigned "limited weight" to the disability opinion of Dr. Wilson, a treating physician, because it was inconsistent with the record evidence. Dr. Wilson had concluded that Pressley could perform the full range of sedentary work, defined as lifting no

more than ten pounds at a time and occasionally lifting or carrying light objects. See 20 C.F.R. § 404.1567(a). Notwithstanding that conclusion, Dr. Wilson further noted that Pressley could sit only for four hours in an eight-hour day, and only stand/walk for three hours. The ALJ afforded "no weight" to Dr. Wilson's opinion with respect to sitting, standing and walking because there were no objective or clinical findings to support these restrictions. The ALJ noted that Dr. Wilson was treating Pressley only for shoulder impairments and not for problems that interfered with sitting, standing and walking.

Additionally, the ALJ afforded "great weight" to the opinions of treating physician Dr. Gonazalez and consultative physician Dr. Kendrick, both of whom found no restrictions on Pressley's ability to sit, stand or walk. The ALJ noted that Dr. Revan, an examining physician, concluded that Pressley had mild limitations with walking or standing due to foot and back pain, and limitations on sitting due to shoulder and neck pain, but these restrictions were based on Pressley's subjective reporting and not clinical findings. This analysis comports with the treating physician rule.

In other respects, the ALJ's RFC is largely consistent with (or more restrictive than) Dr. Wilson's opinion. The ALJ concluded that Pressley's right upper extremity impairment prohibited him from any right-hand overhead lifting or lifting of more than two pounds occasionally. There were no restrictions in his RFC with respect to his left upper extremity, and when using both hands, Pressley could lift or carry up to ten pounds frequently, and up to 15 pounds occasionally. By comparison, Dr. Wilson concluded that Pressley could occasionally lift and carry up to ten pounds and occasionally reach overhead. Thus, the ALJ assessed even more significant restrictions than Dr. Wilson. Moreover, Dr. Wilson concluded that Pressley could

perform sedentary work, undermining any claim that adopting Pressley's treating physician's opinion would lead to a disability finding.

Finally, although Dr. Wilson and his colleague reported to the WCB that Pressley was "totally disabled" because of his right shoulder impairment, this determination does not establish Pressley's eligibility for DIB because different statutory standards for disability apply under the Social Security Act and the New York Worker's Compensation Law. See Shiver v. Apfel, 21 F. Supp. 2d 192, 197 (E.D.N.Y. 1998). Under workers' compensation, disability is defined as "the inability of an employee, as a result of injury or sickness . . . to perform the regular duties of his employment or the duties of any other employment which his employer may offer him." N.Y. Workers' Compensation Law § 201(9). In contrast, the Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that is expected to last 12 months or longer. 42 U.S.C. § 423(d)(1)(A). Furthermore, a statement by a medical source that a claimant is "disabled" or "unable to work" is not dispositive—the determination of whether a claimant meets the statutory definition of disability is reserved for the Commissioner. See 20 C.F.R. § 404.1527(d)(1). Other than this ultimate conclusion, Pressley does not identify any material way in which the ALJ failed to consider the opinion of Pressley's treating physician.

Because he considered Dr. Wilson's opinion and examined its consistency with the record as a whole, the ALJ properly "applied the substance of the treating physician rule." Halloran, 362 F.3d at 32. Although the ALJ may have failed to address explicitly each of the factors in the treating physician test, any such error was harmless.

B.      **Substantial Evidence**

Pursuant to SSA Regulations, a claimant is capable of performing light work if he can lift up to 20 pounds at time with frequent lifting or carrying of objects that weigh up to ten pounds. See 20 C.F.R. § 404.1567(b). Additionally, the claimant must be able to engage in a "good deal" of walking or standing, or when the job requires sitting most of the time, the claimant must be able to engage in some pushing and pulling of leg controls. Id.

There is substantial evidence in the record to support the ALJ's conclusion that Pressley retained the functional capacity to perform less than the full range of light work. Dr. Kendrick concluded that Pressley had no limitations on sitting, standing or walking. Similarly, Dr. Revan concluded that Pressley had only "mild" limitations on sitting, standing and walking. These findings support the ALJ's determination that Pressley had no restrictions on his ability to walk, sit or stand.

The ALJ's determination that Pressley retained limited use of his right arm was also supported by substantial evidence. Dr. Kendrick noted that recent treatment notes and clinical findings concerning Pressley's right shoulder showed improved range of motion with residual pain due to an incomplete septal tear. Based on this evidence, as well as Pressley's subjective reports of pain, Dr. Kendrick concluded that Pressley could lift up to five pounds to desk and chest level. This testimony was supported by Dr. Gonzalez's observations that Pressley had intact rotator cuff strength, well-healed scars, and residual range of motion stiffness secondary to adhesions with no full-thickness tear. He recommended the Pressley avoid lifting and overhead reaching with his right arm. Similarly, Dr. Revan noted deficits in Pressley's range of motion and weakness in his right arm and concluded that he had moderate limitations related to gross motor activities with the right upper extremity. These findings support the ALJ's determination that

Pressley could not engage in overhead reaching and could lift only up to two pounds with his right arm. As noted above, this finding was actually *more restrictive* than Dr. Wilson's assessment that Pressley was able to engage in occasional overhead reaching, as well as Pressley's own testimony that he was able to lift up to 20 pounds with his right arm.

Furthermore, the ALJ's conclusion that when using both hands, Pressley could lift up to ten pounds frequently and up to 15 pounds occasionally was supported by the findings of Drs. Wilson and Soren, as well as Pressley's own testimony. In March 2011, Dr. Soren opined that Pressley could occasionally lift up to 20 pounds with both hands. In his August 2011 RFC report, Dr. Wilson concluded that Pressley was capable of lifting up to ten pounds. These findings were supported by Pressley's testimony at the December 2012 hearing that he was able to lift up to 20 pounds with his right arm alone.

Finally, Pressley argues that the ALJ erred when he determined that Pressley could perform "light work," but cited the regulation for sedentary work. At the July 12, 2013 hearing, the ALJ presented the vocational expert with a person of the claimant's background, who had no use of his dominate right arm, but no other restrictions and could lift and carry up to the light limits. (AR 101–02.) This description comports with the RFC finding that Pressley could perform light work, but with limited use of his right arm. The Court therefore assumes that the ALJ made an error in his decision and meant to cite to 20 CFR § 404.1567(b), which provides the SSA's definition of "light work."

Because the ALJ's conclusion was supported by substantial evidence on the record, there is no basis for overturning it.

### C.    Consideration of Mental Health Evidence in the RFC

Contrary to Pressley's assertion, the ALJ properly chose not to consider evidence of

Pressley's mental health impairments into his RFC determination. The ALJ noted that Pressley's

depression disorder had not resulted in significant functional limitations for 12 continuous

months, as required for a finding of a severe impairment at step two of the analysis. Additionally,

reports from various consultative mental health examiners support the ALJ's finding that

Pressley's mental health issues did not markedly interfere with his daily life. Dr. Rosenfeld

diagnosed Pressley with adjustment disorder with mixed anxiety and depressed mood, but

concluded that "from a psychological viewpoint, [Pressley] is able to perform his usual daily

activities and . . .  return to work without restrictions." (AR 278.) Both Drs. Schreiber and

Harding found that Pressley was able to follow, understand and remember simple instructions,

complete simple tasks, maintain attention and concentration, and keep a regular schedule.

Although Dr. Schreiber noted that Pressley had difficulty dealing with stress, she concluded that

Pressley's mental health problems were not "significant enough to interfere with [his] ability to

function on a daily basis." (AR 343.)

The ALJ also noted that at the time of the December 2012 hearing, Pressley was not

receiving mental health counseling and or taking any psychotropic medication. Furthermore, the

fact that Pressley recently had gained custody of his two daughters led the ALJ to conclude that

he retained the mental ability to care for himself and a minor child, manage his household, and

interact appropriately with others.

Because the ALJ considered evidence of Pressley's mental health impairments and

properly concluded that they did not interfere with his activities of daily living, there was no

error in his failure to include evidence of Pressley's mental health impairments in his RFC analysis.

### D.  Duty to Complete the Record

When the ALJ assesses a claimant's alleged disability, she, "unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quotation marks omitted); see also 20 C.F.R. § 404.1512(d). Under this duty, the ALJ must "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any source on a consultative basis." 42 U.S.C. § 423(d)(5)(B); see also Devora v. Barnhart, 205 F. Supp. 2d 164, 174 (S.D.N.Y. 2002). "Every reasonable effort" means that the ALJ "will make an initial request for evidence" from the claimant's medical source and make one follow-up request between 10–20 calendar days after the initial one. 20 C.F.R. § 404.1512(d)(1). The ALJ also may ask a claimant "to attend one or more consultative examinations at [the Commissioner's] expense."  20 C.F.R. § 404.1512(e). When the ALJ has failed to develop the record adequately, the Court must remand to the Commissioner for further development. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

Pressley's record consists of 747 pages of treatment notes from a wide variety of doctors, including Dr. Wilson and his associates, with documents spanning as far back as 2008 and up to and including May 2013. The notes cover treatment from numerous sources before, during and after the date of alleged disability. Although the ALJ identified inconsistencies between Dr. Wilson's treatment notes and his RFC, the ALJ was permitted to weigh the relevant evidence and

make a determination regarding Pressley's disability status without re-contacting Dr. Wilson. See 20 CFR § 404.1520b(b). Because there were no obvious gaps in the administrative record and the ALJ already had access to a complete medical history, the ALJ was under no obligation to seek additional information from Dr. Wilson before rejecting Pressley's claim. See Rosa, 168 F.3d at 79 n.5.

### E.    Credibility Assessment

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of his impairment. Tejada v. Apfel, 167 F.3d 770, 775–76 (2d Cir. 1999); 20 C.F.R. § 404.1529(c). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ should consider all available evidence, including objective medical evidence as well as the claimant's daily activities, the location, nature, extent, and duration of his symptoms, precipitating and aggravating factors, the type, dosage, effectiveness and side effects of medications taken, and other treatment undertaken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)–(iv). A court may set aside a credibility determination only when it is not supported by substantial evidence. See Aponte v. Sec., Dep't of Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

The ALJ properly considered Pressley's subjective statements concerning the intensity, persistence and limiting effects of his pain in the context of the objective medical findings and other evidence in the record. The ALJ focused his analysis on objective medical evidence, which generally did not include findings that Pressley had functional limitations on his ability to sit, stand or walk. He noted that Dr. Revan's findings that Pressley had "mild" to general limitations in these areas were based solely on Pressley's own subjective allegations of pain. In her

examination notes, Dr. Revan wrote that Pressley's gait was normal and he could walk on toes and heels without difficulty. She observed that he used no assistive devices and did not require help changing or getting on and off the exam table. The ALJ also noted that there were no clinical notes in Dr. Wilson's files to support his conclusion that Pressley was limited to standing for three hours and sitting for four hours in a workday.

The ALJ also credited Pressley's subjective reports of pain in his right shoulder, which were supported by objective medical evidence. He concluded that Pressley could perform no overhead lifting and was limited to carrying two pounds with his right arm. Although Pressley claims that the ALJ failed to consider his testimony that he could lift no more than one pound with his right hand and could not raise his arm above chest level, the jobs that the vocational expert provided required only the use of one arm and therefore conform with Pressley's self-assessed limitations. Accordingly, any error in the ALJ's evaluation of Pressley's testimony is harmless.

## CONCLUSION

For the aforementioned reasons, Pressley's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion for judgment on the pleadings is granted.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:       New York, New York
             September 16, 2016